

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-20-00330-CV

_____

YUE QI, Appellant

V.

HANYANG AN AND RUOLIN WANG, Appellees

On Appeal from the 462nd District Court
Denton County, Texas
Trial Court No. 17-10422-362

Before Birdwell, Bassel, and Wallach, JJ.
Memorandum Opinion by Justice Bassel

**MEMORANDUM OPINION**

## I. Introduction

Appellant Yue Qi failed to file an answer after being served by substitute service via email and posting the documents on his front door. The trial court rendered a no-answer default judgment against Qi and awarded Appellees Hanyang An and Ruolin Wang damages and costs totaling $1,348,451.64, prejudgment interest totaling $111,201.08, and attorneys' fees and nontaxable expenses totaling $70,258.70.

On appeal, Qi argues that he is entitled to a new trial under *Craddock*[1] because he was served via his Gmail account while he was in the process of moving back to China where Gmail is blocked; alternatively, Qi argues that he is entitled to a new trial on unliquidated damages and attorneys' fees because Appellees did not plead an indemnity claim and because the trial court made the award of attorneys' fees without hearing evidence. Appellees did not file a brief.

Because Qi was served via substituted service by appending the citation and other documents to his front door on February 16, 2018, and did not leave for China until March 12, 2018, and because he stated that his plan was to wait and see what evidence Appellees would put on and then appeal if it did not go well for him, he has not overcome the initial *Craddock* prong—that his failure to answer was not intentional or the result of conscious indifference. Because Appellees did not plead an indemnity claim but because it is unclear from the default judgment how much the

---

[1]*Craddock v. Sunshine Bus Lines*, 133 S.W.2d 124, 126 (Tex. [Comm'n Op.] 1939).

trial court awarded for the unpleaded indemnity claim, we reverse and remand for the trial court to modify the judgment to delete the damages that were awarded for indemnity. And because the trial court abused its discretion by awarding damages for an unpleaded indemnity claim, we reverse the portion of the judgment awarding attorneys' fees and remand the cause to the trial court for a redetermination of the amount of reasonable and necessary attorneys' fees.

## II. Factual and Procedural Background[2]

In October 2016, Appellees and Qi, along with Yutian Zhang,[3] commenced discussions regarding a potential investment in a Bareburger franchise to be located in the Dallas/Fort Worth metroplex. Qi and Zhang represented to Appellees that they had substantial net worth and would not only be able to pay their portion of the anticipated capital and costs but that they would be able to cover any future liabilities of the to-be-formed company. The parties agreed to form a limited liability company owned 50% by An and 50% by Zhang.

The following month, An and Zhang executed the Company Agreement of Omibear Restaurant Management LLC. Pursuant to the Omibear Agreement,

---

[2]In a no-answer default judgment, the defendant's failure to answer operates as an admission of all the material facts alleged in the plaintiff's petition, except for unliquidated damages. *Dolgencorp of Tex., Inc. v. Lerma*, 288 S.W.3d 922, 930 (Tex. 2009); *Holt Atherton Indus., Inc. v. Heine*, 835 S.W.2d 80, 83 (Tex. 1992). We therefore borrow heavily from Appellees' original petition for the factual background.

[3]Zhang was married to Qi when the events that formed the basis of the suit occurred, but she is not part of this appeal.

Omibear was formed for the purpose of entering into a franchise agreement and developing, operating, owning, and managing a Bareburger restaurant. In January 2017, Omibear entered into a franchise agreement with Bareburger Group LLC.

Five days after entering into the franchise agreement with Bareburger, Qi sent an invoice purportedly received by Qi from Bareburger in the aggregate amount of $440,000 for (i) an initial franchise fee of $50,000; (ii) $275,000 for equipment, furniture, and fixtures; (iii) $50,000 for a point-of-sale computer system; (iv) $5,000 for advertising; and (v) $60,000 for blueprints and design. At the time, Qi represented to An that Qi had already paid the entire $440,000 to Bareburger from his personal funds and that An, therefore, owed Qi $220,000 for An's portion of the invoice. In reliance upon Qi's representations, An paid a total of $220,000 to Qi and his family members via five separate transfers: An's mother sent Qi's mother $100,000; An wired $6,000 to Zhang; An paid Qi $50,000 and $59,000 via two transactions; and An paid $10,000 ($5,000 of which was owed by Zhang) to Omibear's checking account as a capital contribution. Appellees later learned that Qi had never paid the invoice amount to Bareburger.

Shortly after An contributed $5,000 to the Omibear checking account for An's capital contribution and an additional $5,000 for Zhang's capital contribution, Qi withdrew the entire $10,000, and such amount was used by Qi and Zhang for their own personal benefit and not for Omibear.

4

In June 2017, Omibear entered into a ten-year lease with Excel Southlake I LP (landlord) for a space located in a Southlake shopping center. In connection with the lease, Appellees, Qi, and Zhang each executed lease guaranties. Prior to entering into the lease guaranties, Qi and Zhang represented that they had sufficient financial means to perform under the lease and to satisfy any obligations of Omibear should Omibear for any reason be unable to perform its obligations under the lease. In signing the lease guaranties, Appellees relied on Qi and Zhang's representations with regard to their personal net worth and their ability to perform under the lease guaranties should Omibear fail or be unable to meet any of the obligations under the lease.

To further eliminate any of Appellees' concerns with respect to the lease guaranties, Qi represented to An that Bareburger would guarantee the lease for a fee of $120,000 and that An would only have to pay $30,000 of the $120,000 with the remaining $90,000 to be paid by Qi. An, in reliance on Qi's representation, transferred $30,000 to Qi's personal bank account for payment of the fee to Bareburger in exchange for Bareburger's guaranty of the lease. Subsequently, Qi advised An that Bareburger returned the $120,000 fee to Qi's personal bank account, but Qi never returned to An any portion of the $30,000 that An had paid.

In July 2017, Qi contacted An and represented to him that Bareburger was requesting that Omibear send a payment of $34,600 for a design fee. An wired to Omibear's account the aggregate amount of $70,000 to cover the design fee payable

to Bareburger and other operational payments for Omibear that Qi claimed An needed to pay. Appellees later learned that (i) Bareburger never requested a design fee; and (ii) although An transferred $34,600 from Omibear's account to pay Bareburger, upon Bareburger's receipt of the funds, Qi contacted Bareburger and instructed Bareburger to pay the $34,600 received from Omibear's checking account to Qi's personal bank account. Pursuant to Qi's instructions, the $34,600 was paid to Qi.

During 2017, An paid additional amounts to Qi and on his behalf as he requested, including having his (An's) father transfer $36,232 to Qi's mother. In September 2017, Qi, Zhang, or both Qi and Zhang made unauthorized and unexplained withdrawals totaling $12,700 from Omibear's business checking account.

In October 2017, Appellees began to uncover the falsity of many of Qi's prior representations and the misuse of funds paid by An to Qi or to Omibear including, but not limited to, Qi and Zhang's failure to pay the $440,000 to Bareburger as represented and Qi's instructions to Bareburger to deposit the design fee directly into Qi's personal bank account. When confronted, Qi and Zhang admitted that they had made misrepresentations to Appellees and had used funds that An had sent to them or to Omibear for their own personal benefit. Qi and Zhang assured Appellees that Appellees would be repaid the entire amount of funds that Qi and Zhang had misappropriated, as well as the $36,232 loan that An had sent Qi's mother and other amounts that An had loaned Qi personally.

6

Shortly thereafter, Qi executed and delivered to An a promissory note dated October 17, 2017, payable to An in the principal amount of $104,720, together with interest on the unpaid principal balance at six percent per annum (the An Note). The An Note was payable in full on October 31, 2017, at which time all outstanding principal plus all accrued but unpaid interest was immediately due and payable.

Additionally, on October 17, 2017, Qi executed and delivered to Omibear a promissory note dated October 17, 2017, payable to Omibear in the principal amount of $147,700, together with interest at six percent per annum (the Omibear Note). The Omibear Note was payable on October 31, 2017, at which time all outstanding principal plus all accrued but unpaid interest was immediately due and payable. When the An Note and the Omibear Note matured on October 31, 2017, Qi failed to pay any portion of the principal or the accrued but unpaid interest on the notes.

Appellees hired counsel, who by letter dated November 2, 2017, made demand upon Qi and Zhang for the aggregate sum of $467,706.75 to be paid on or before November 7, 2017, and advised Qi and Zhang that Appellees intended to file a legal proceeding to collect the amount unless Qi and Zhang timely executed the demand letter and agreed to pay $467,706.75 pursuant to the schedule below:

- $54,036.75 to be paid on or before November 10, 2017;

- $75,500 to be paid on or before November 24, 2017;

- $128,170 to be paid on or before December 15, 2017;

- $123,830 to be paid on or before January 15, 2018; and

• $86,170 to be paid on or before January 31, 2018.

In the letter, Appellees also demanded that Qi and Zhang take action to have Appellees removed as guarantors of the lease on or before November 24, 2017.

On or about November 7, 2017, and November 14, 2017, Qi and Zhang signed the demand letter thereby agreeing to pay the aggregate sum of $467,706.75 in accordance with the schedule set forth in the letter and to cause the landlord to release Appellees from any obligation under the lease guaranties on or before November 24, 2017, which deadline was extended to December 8, 2017, by agreement of the parties.

Although untimely, Qi and Zhang made the initial payment of $54,036.75 to Appellees. Qi and Zhang failed to pay the second installment due and payable under the terms of the letter agreement in the amount of $75,500. Qi and Zhang also failed to obtain the release of Appellees from the lease guaranties by the deadline provided in the letter agreement. After repeated requests for payment and for Qi and Zhang to perform their obligations under the letter agreement were not carried out, Appellees filed suit against Qi and Zhang in December 2017, (1) alleging claims for breach of contract, "claim on note," fraud, theft, conversion, negligent misrepresentation, money had and received, and unjust enrichment and (2) seeking attorneys' fees. Appellees obtained an order allowing substituted service on Qi.

In June 2018, the landlord filed suit against Omibear, Appellees, and Qi for defaulting on the lease by failing to make rent payments. In the landlord suit, the

landlord moved for summary judgment against all parties and requested the amount lawfully found due on the lease ($843,930.99), plus attorneys' fees ($1,500.00), together with interest at the legal rate from the date of the judgment until paid in full.

In February 2019, after Qi had failed to answer Appellees' suit, Appellees filed a motion for default judgment. The trial court granted the motion for default judgment, stating that

> [t]he [c]ourt has read the pleadings and the papers on file, and is of the opinion that the allegations of [the] Original Petition have been admitted, and [Appellees'] claims for[] (i) breach of contract; (ii) suit on the An Note; (iii) theft under the Texas Theft Liability Act; (iv) conversion; (v) money had and received; and (vi) unjust enrichment[] are liquidated in the amount of $1,347,754.59. Additionally, the [c]ourt finds that, on good and sufficient evidence presented to the [c]ourt, [Appellees] should recover their taxable court costs which the court finds to be $697.05, their reasonable and necessary attorneys' fees which the court finds to be $70,209.90, and their non-taxable expenses which the court finds to be $48.80. [Footnote defining the An Note omitted.]

The trial court also awarded Appellees $111,201.08 as prejudgment interest.

Although the trial court signed the default judgment against Qi on August 14, 2019, the case continued because Appellees had claims pending against Zhang. Eleven months later, the trial court held a bench trial and entered a post-answer default judgment against Zhang on July 22, 2020.

On August 21, 2020, Qi filed his motion for new trial and alternative motion for remittitur. The motion was overruled by operation of law. *See* Tex. R. Civ. P. 329b(c). After the motion was overruled by operation of law, the trial court retained plenary power for an additional thirty days. *See* Tex. R. Civ. P. 329b(e). During that

9

time, Qi's attorneys set a hearing on his motion for new trial for October 26, 2020. Appellees filed a response the same day as the hearing. Because the trial court had not had adequate time to review Appellees' response, the hearing was continued until October 29, 2020.

The trial court held a hearing on the motion for new trial on October 29, 2020. At the conclusion of the hearing, the trial judge stated that she was going to finish reading the parties' documents and would tell the parties her decision before the trial court's plenary power expired on November 4, 2020. However, no written order appears in the record.

### III. First *Craddock* Prong Was Not Met

We begin with Qi's third issue because it would entitle him to the greatest relief—a new trial on liability, damages, and attorneys' fees, unlike his other issues that are limited to damages and attorneys' fees. In his third issue, Qi argues that the trial court abused its discretion by refusing to grant a new trial under *Craddock*. Although Qi provides an explanation for his failure to answer the suit, his explanation does not meet the first prong of *Craddock* to show that his failure to answer was not intentional or the result of conscious indifference.

#### A. Standard of Review and Applicable Law

We have previously set forth the standard of review and the *Craddock* test as follows:

10

We review a trial court's denial of a motion for new trial for abuse of discretion. *In re R.R.*, 209 S.W.3d 112, 114 (Tex. 2006). A default judgment should be set aside and a new trial granted if (1) the failure to answer was not intentional or the result of conscious indifference but was due to a mistake or accident, (2) the defendant sets up a meritorious defense, and (3) the motion is filed at such time that granting a new trial would not result in delay or otherwise injure the plaintiff. *Id.* at 114–15 (citing *Craddock*[, 133 S.W.2d at 126]). The defendant's burden as to the first *Craddock* element has been satisfied when the factual assertions, if true, negate intentional or consciously indifferent conduct by the defendant and the factual assertions are not controverted by the plaintiff. *Sutherland v. Spencer*, 376 S.W.3d 752, 755 (Tex. 2012).

Consciously indifferent conduct occurs when "the defendant knew it was sued but did not care." *Id.* "When determining whether the defendant's failure to file an answer was intentional or due to conscious indifference, a court looks to the knowledge and acts of the defendant." *R.R.*, 209 S.W.3d at 115. Some excuse, although not necessarily a good one, will suffice to show that a defendant's failure to file an answer was not because he did not care. *Sutherland*, 376 S.W.3d at 755. However, not understanding a citation and then doing nothing following service does not constitute a mistake of law that is sufficient to meet the *Craddock* requirements. *R.R.*, 209 S.W.3d at 115.

*$2,442.00 Current Money of U.S. v. State*, No. 02-19-00021-CV, 2019 WL 3334434, at *1–2 (Tex. App.—Fort Worth July 25, 2019, no pet.) (mem. op.). We must defer to the trial court's credibility determinations to determine whether nonappearance was intentional or due to conscious indifference. *Parsons v. Parsons*, No. 01-18-00902-CV, 2019 WL 5382637, at *4 (Tex. App.—Houston [1st Dist.] Oct. 22, 2019, no pet.) (mem. op.).

## B. Analysis

Here, the record demonstrates that Appellees obtained an order allowing substituted service. *See* Tex. R. Civ. P. 106(b). The order permitted Appellees to

11

serve Qi by (1) emailing the citation, petition, and a copy of the substituted-service order to Qi's Gmail account and to his attorney's email and (2) securely affixing the citation, petition, and a copy of the substituted-service order to Qi's usual place of abode on University Boulevard. The record contains the service of return regarding the email and the return of service from the process server showing that the documents were served on Qi's usual place of abode and that the substituted service was completed on February 16, 2018.

Qi argued in his motion for new trial and argues on appeal that he did not see the email until after his answer was due because he did not check his email between February 16, 2018, and March 13, 2018 (the date that he arrived in China). Qi gives several explanations for why he did not check his Gmail account during that time frame, but we need not detail his reasons. Instead, we focus on the other form of substituted service that was effectuated by affixing the documents to the door of Qi's residence. Qi makes no mention of that form of substituted service, nor does he explain why he ignored the citation that was affixed to the door of his residence almost a month before he relocated to China.

Qi admits that the citation informed him that a default judgment could be taken against him if he did not file an answer. As for why he did not file an answer after learning about the suit, Qi averred in the affidavit attached to his motion for new trial that he did not believe that Appellees had evidence to prove the amount of money that they claimed Qi owed, that he did not have money to pay an attorney, and

12

that he therefore planned to wait and see what evidence Appellees presented and what the trial court did; if it did not go well for Qi, he planned to "appeal and start over." Qi assumed that the legal process in the United States would operate the same as that in China, which he explained as requiring a plaintiff in a default-judgment scenario to put on evidence to support his claims and as allowing a default judgment to be challenged under a de novo standard.

Qi urges us to hold that his failure to answer was excused because it was based on a mistake of law—his mistaken belief that United States courts would operate the same as Chinese courts. In the Texas Supreme Court case that Qi relies on, the bank's branch president did not file a written answer to the writ of garnishment because he thought that it was a sufficient answer to freeze the subject accounts and tender the balance of the accounts to the court issuing the writ. *See Bank One, Tex., N.A. v. Moody*, 830 S.W.2d 81, 84–85 (Tex. 1992). That case is distinguishable because the defendant took an action (as opposed to deciding on inaction) that he thought was the answer that the writ required. *See id.* at 85. Moreover, that case specifically states that not every act of a defendant that could be characterized as a mistake of law is a sufficient excuse. *See id.* at 84. As examples, the Texas Supreme Court cites a case in which an attorney made a conscious decision not to file an answer based on a mistaken belief about the effect of a bankruptcy stay and a case in which a defendant read but did not understand the citation and did nothing. *See id.* (first citing *Carey Crutcher, Inc. v. Mid-Coast Diesel Servs., Inc.*, 725 S.W.2d 500, 502 (Tex. App.—Corpus

Christi–Edinburg 1987, no writ), *disapproved on other grounds by Dir., State Emps. Workers'*

*Comp. Div. v. Evans*, 889 S.W.2d 266, 268 (Tex. 1994); and then citing *Butler v. Dal Tex*

*Mach. & Tool Co.*, 627 S.W.2d 258, 260 (Tex. App.—Fort Worth 1982, no writ)).

These examples of inaction are more in line with the scenario before us.

Here, Qi ignored the fact that he had been served with citation and that he had

been instructed that a default would be taken if he did not file an answer. Qi had

been represented by an attorney in the United States throughout the settlement

negotiations; yet, when that attorney informed Qi that the matter was "extremely

urgent" and that Qi needed to pay his outstanding invoice in order to obtain

assistance with this matter, Qi did not pay. Qi instead relied on a faulty assumption

that a default judgment in the United States would operate the same as one in China.

Qi's mistake is not a sufficient excuse.

Based on this record, we conclude that the trial court could have properly

found that Qi did not act as a reasonable person would have in similar circumstances

and that he exhibited conscious indifference to filing an answer. *See Dunn v. Parker*,

No. 06-19-00036-CV, 2019 WL 4559096, at *3 (Tex. App.—Texarkana Sept. 20,

2019, no pet.) (mem. op.) ("Consequently, the trial court could have reasonably

concluded that [appellant,] knowing that his answer was due and that he needed to

retain another attorney, was consciously indifferent to his obligation to do so.");

*$2,442.00 Current Money of U.S.*, 2019 WL 3334434, at *2 ("[Appellant] simply stated

that he did not understand and sat idly[.] . . . Without more, [appellant's] explanation

14

does not negate conscious indifference."). Qi thus failed to meet the first prong of the *Craddock* test. *See Dunn*, 2019 WL 4559096, at *4. Accordingly, we hold that the trial court did not abuse its discretion by not granting the motion for new trial. We overrule Qi's third issue.

## IV. Indemnity Claim Was Not Pleaded

In his first issue,[4] Qi argues that the trial court's default judgment must be set aside as to the award of unliquidated damages.[5] Qi lists several reasons to set aside the unliquidated damages award, but we focus on his pleading argument—that Appellees did not assert an indemnity claim in their original petition and did not amend their petition to add the claim after the landlord filed suit. Because a trial court

---

[4]Qi's "Issues Presented" section couches his first and second issues differently than his arguments in his brief. We follow the order that was used in his brief, recognizing as his first issue his arguments attacking the indemnity award and as his second issue his arguments attacking the award of attorneys' fees. Neither issue depends on successfully arguing *Craddock*.

[5]Although the trial court labeled the damages amount as "liquidated," at the hearing on Qi's motion for new trial, Appellees did not dispute Qi's reclassification of the damages pertaining to the unpleaded indemnity claim as unliquidated damages:

> [QI'S ATTORNEY:] The unliquidated damage is separate. [Appellees' attorney] has zero response to that in his written response on file on the unliquidated damages portion.

> THE COURT: Okay.

> [APPELLEES' ATTORNEY]: And we don't have any problem with that because we've already told these guys we'd agree on that matter, Judge.

15

cannot award damages on an unpleaded claim that was not tried by implied consent, the damages on the unpleaded indemnity claim cannot stand.

A default judgment must be supported by the pleadings. *See* Tex. R. Civ. P. 301; *Stoner v. Thompson*, 578 S.W.2d 679, 682 (Tex. 1979). This rule is a specific application of the more general principle that a party may not be granted relief in the absence of pleadings to support that relief, unless the request for relief is tried by consent—a situation that cannot occur in the context of a default judgment. *In re Marriage of Day*, 497 S.W.3d 87, 90 (Tex. App.—Houston [14th Dist.] 2016, pet. denied) (first citing *Stoner*, 578 S.W.2d at 682; and then citing *Maswoswe v. Nelson*, 327 S.W.3d 889, 895–96 (Tex. App.—Beaumont 2010, no pet.)). A default judgment not supported by the pleadings is fundamentally erroneous. *Caruso v. Krieger*, 698 S.W.2d 760, 762 (Tex. App.—Austin 1985, no writ). Absent fair notice, a party who fails to appear at trial will not be held to have tried an unpleaded cause of action by implied consent. *Stoner*, 578 S.W.2d at 685.

Here, Appellees pleaded the following causes of action in their original petition: breach of contract, "claim on note," fraud, theft, conversion, negligent misrepresentation, money had and received, and unjust enrichment. As pointed out by Qi,

> Appellees' original petition does [not] assert an indemnity claim or seek any damages from Qi's alleged failure to secure releases. Nor does it allege any facts regarding a lawsuit by the landlord or a default of the lease. Indeed, the petition states that Qi and Zhang's actions "exposed [Appellees] to *potential* liability to the business's landlord." But the

16

alleged default of the lease did not occur until February 1, 2018 ([two] months *after* [Appellees] filed the petition)[,] and the landlord did not file a lawsuit until four months later, on June 1, 2018. Appellees could have amended their petition—and served it on Qi—asserting an indemnity claim based on the landlord's lawsuit. But they did not[] and instead tried to slide those alleged damages in a footnote in their motion [f]or default judgment. [Footnotes omitted.]

Because there were no pleadings to support judgment for the amount allegedly due and owing to the landlord for the alleged breach of the lease guaranty by Appellees, the trial court abused its discretion by imposing damages based on a claim not included in Appellees' petition. We sustain Qi's first issue as to the damages awarded for indemnity and reverse and remand for the trial court to modify the default judgment to delete the portion of the damages attributable to the unpleaded indemnity claim.[6] *See Williams v. Asset Acceptance LLC*, No. 03-11-00520-CV, 2012 WL 2989219, at *6 (Tex. App.—Austin July 20, 2012, no pet.) (mem. op.) (vacating "portion of final default judgment awarding [appellee] amounts due on the First USA/Chase Bank account" because appellee did not plead any entitlement to money

---

[6]It is unclear from the default judgment how much the trial court awarded for the unpleaded indemnity claim. Appellees' motion for default judgment requested "an award of liquidated damages in the amount of $424,074.73 **plus (+)** at least $845,430.99." [Footnotes omitted.] Appellees' motion for default judgment included a footnote explaining that the $845,430.99 was "the amount allegedly due and owing to [*l*]andlord as of December 18, 2018[,] for the alleged breach of the [*l*]ease [g]uaranty by [Appellees]." Adding $424,074.73 to $845,430.99 equals $1,269,505,72, but the default judgment awards $1,347,754.59. Because the default judgment does not give a breakdown of the amount, we must remand for the trial court to modify the judgment by deleting the amount that it awarded for the unpleaded indemnity claim, thereby leaving only the damages for the pleaded claims.

damages based on that account and first asserted appellant's liability for that account as part of its motion for default judgment).[7]

## V. Attorneys' Fees Must Be Remanded

In his second issue, Qi argues that the default judgment must be set aside for a new trial on attorneys' fees. Having determined that the trial court abused its discretion by awarding damages for an unpleaded indemnity claim, we reverse the portion of the judgment awarding attorneys' fees and remand the cause to the trial court for a redetermination of the amount of reasonable and necessary attorneys' fees. *See Bossier Chrysler-Dodge II, Inc. v. Rauschenberg*, 238 S.W.3d 376, 376 (Tex. 2007); *Barker v. Eckman*, 213 S.W.3d 306, 314–15 (Tex. 2006); *Haynes v. Haynes*, No. 04-15-00107-CV, 2017 WL 2350970, at *7 (Tex. App.—San Antonio May 31, 2017, pet. denied) (mem. op.); *see also Powell Elec. Sys., Inc. v. Hewlett Packard Co.*, 356 S.W.3d 113, 129 (Tex. App.—Houston [1st Dist.] 2011, no pet.) ("Because we have meaningfully reduced the amount of [appellee's] damages on appeal, we must reverse the attorney's fees award and remand for a determination of attorney's fees."). Accordingly, we sustain Qi's second issue.

---

[7]Alternatively, even if Appellees had pleaded a claim for indemnity, the requested award of approximately $850,000 could not stand as it was established at the hearing on Qi's motion for new trial that Appellees had settled the landlord suit for $50,000. Thus, it would be a tremendous windfall for Appellees to be awarded $800,000 more than what they settled for.

## VI.  Conclusion

Having overruled Qi's third issue, we affirm the default judgment as to both liability and the damages on Appellees' claims for breach of contract, "claim on note," fraud, theft, conversion, negligent misrepresentation, money had and received, and unjust enrichment.  Having sustained Qi's first issue as to the unliquidated damages awarded to Appellees for an unpleaded indemnity claim, we reverse and remand for the trial court to modify the default judgment to delete the award attributed to the unpleaded indemnity claim.  Having sustained Qi's second issue, we reverse and remand for a new trial as to attorneys' fees.

/s/ Dabney Bassel

Dabney Bassel
Justice

Delivered:  October 28, 2021